IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 09, 2015 Session

## IN RE DOMINGO W., ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH1301991     Walter L. Evans, Chancellor**

_____

**No. W2014-01435-COA-R3-PT – Filed July 23, 2015**
_____

In this termination of parental rights case, Mother appeals the trial court's findings of incompetency and persistence of conditions as grounds for termination. Mother also appeals the trial court's conclusion that termination was in the children's best interest. We affirm the trial court's findings as to both grounds for termination. We also affirm the trial court's finding that termination is in the best interest of the children. Accordingly, we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and BRANDON O. GIBSON, J., joined.

Shantell S. Suttle, Cordova, Tennessee, for the appellant, Samantha W.

Herbert H. Slatery, III, Attorney General and Reporter; Paul Jordan Scott, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### Background

Samantha W.[1] ("Mother") is the mother to two children, Jamarcus W. and Domingo W.[2] Jamarcus was born to Mother in February 2009. Domingo was born to Mother in September 2011.[3] At the time of trial in this matter, Jamarcus was five years old, and Domingo was two years old.

Mother has a lengthy history with the Tennessee Department of Children's Services ("DCS") and foster care. Due to abandonment by her own mother and relatives, Mother herself most recently entered DCS custody on March 29, 2011 at age seventeen while pregnant with Domingo. At this time, Mother's only child was then two-year-old Jamarcus, who also entered DCS's custody via a voluntary placement agreement in which Mother relinquished legal custody. While in DCS's legal custody, both Mother and Jamarcus resided with Vonetta J. ("Foster Mother") and Greg J. ("Foster Father," collectively, "Foster Parents").[4]

Throughout the next several months, Mother underwent a series of assessments, counseling sessions, and medical appointments facilitated by DCS.[5] During May and June 2011, Mother was admitted to participate in individualized counseling at Youth Villages. Her counseling sought to address her problems with "anger management, defiant behaviors, inappropriate sexual behaviors, physical aggression, truancy, verbal aggression, and low parenting skills." For example, in one assessment, Youth Villages noted that Mother often threatened to hit Jamarcus when he did not comply with her directions.

In addition, Mother was admitted to Saint Francis Hospital in August 2011 when she was eight months pregnant with Domingo. She presented with depression and suicidal ideation after threatening to kill herself. Mother was diagnosed with several disorders,

---

[1] In cases involving minor children, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] The record indicates that Mother has a third child, who currently lives with a relative. This child is not at issue in this matter.

[3] No father was listed on either child's birth certificate, and neither child's father appeared at any point during these proceedings. Accordingly, Mother is the sole appellant.

[4] The record indicates that Mother resided in as many as seven foster homes, but many placements were disrupted because of Mother's aggressive behavior. Foster Parents were her final placement as a minor. However, as discussed *infra*, Mother returned to foster care after she reached majority and resided with another foster family for a brief time. At some point, DCS attempted to reach out to Mother's relatives to obtain assistance for her to no avail.

[5] Mother's medical and counseling records do not appear as separate documents in the record; rather, the information regarding these records appears in Dr. Mindy Kronenberg's Psychological Evaluation of Mother. Mother did not dispute the validity of Dr. Kronenberg's classification of these records entered at trial.

including "Depressive Disorder[], ADHD, Conduct Disorder – Adolescent Onset," and was subsequently discharged after ten days.

In August 2011, Mother participated in two additional psychological evaluations. The first evaluation occurred at the Center of Excellence at the University of Tennessee Health Sciences Center ("UTHSC"). This psycho-educational evaluation determined that Mother had a mild intellectual disability, and her functioning, judgment, and decision making skills were similar to that of an eight- to ten-year-old child. A second evaluation by UTHSC, a psychiatric evaluation, determined that Mother was a "young woman who has lived a 'chaotic, unstable, neglectful' life which has resulted in 'difficulty with impulse control, judgment, and keeping herself and her children safe.'" Ultimately, the evaluator found that Mother would be unable to gain significant parenting abilities even with support.

Subsequently, Mother, still a minor, gave birth to Domingo while residing with Foster Parents. In September 2011, several days after Domingo's birth, Magistrate David Ferguson of the Shelby County Juvenile Court signed a Protective Custody Order removing both children from Mother's custody. The Protective Custody Order provided that both a DCS case manager and Foster Parents witnessed Mother inappropriately disciplining Jamarcus. Further, the order provided that the case manager and Foster Parents attempted to address these issues with Mother, but the behaviors continued. Specifically, according to the order, Mother became angry with Foster Parents and pushed Jamarcus to the floor, resulting in a knot on the back of his head. The order also made note of Mother's admittance to Saint Francis hospital stemming from her threats to commit suicide and also kill her then-unborn child, Domingo. Although the precise dates are unclear from the record, it appears that DCS continued providing services to Mother at the time her children entered temporary DCS custody.

In support of the protective custody order, the juvenile court also discussed the intellectual and adaptive functioning evaluations performed on Mother by UTHSC in August 2011. According to the protective custody order, the findings produced by the evaluation showed that Mother's "mildly delayed cognitive functioning and low adaptive skills support a diagnosis of intellectual disability, mild. . . . Without a great deal of permanent support and supervision, [Mother] will not be able to adequately care for her older child or her newborn baby." Further, the magistrate's order provides that Mother's judgment, planning, and decision-making skills were that of an eight- to ten-year-old child according to her evaluation. Accordingly, temporary legal custody of Jamarcus and Domingo was awarded to DCS. Despite the alteration of custody, it appears that DCS continued to provide Mother with various services related to guidance on parenting, individual counseling, and the facilitation of regular visitation.

Mother turned eighteen years old in October 2011, which would typically cause her to "age out" of foster care. However, DCS was working with Mother to get into an assistance program administered by the Department of Intellectual and Developmental Disabilities ("DIDD"). Because DCS was still providing continuing assistance to Mother, she was permitted to reside with Foster Parents in an "extension of foster care." Mother did so until December 2011 when she opted out of the extension. At this time, she told DCS that she was moving in with her thirty-eight-year old boyfriend, the father of Domingo.

Around this time, Mother participated in a Health Connect Parenting Assessment provided by DCS, although the date is unclear from the record. At the time of this assessment, Mother was eighteen years old, had stopped living with Foster Parents, and had moved in with her boyfriend. The evaluator noted that Mother was able to verbally express how to properly care for the children. However, the evaluator noted that Mother did not invite her into the apartment, nor did Mother appear to have access to a car seat for the children.[6] The evaluator was ultimately unable to complete the evaluation because she was unable to contact Mother to presumably arrange another meeting. She did conclude, however, that she had concerns with Mother's living situation as well as about her ability to effectively parent the children.

When Mother moved out of her boyfriend's home approximately three weeks after moving in, she decided she wanted to opt back into an extension of foster care, which DCS permitted. She also expressed a desire to attempt to get into the DIDD program again. At this time, Mother was placed with another foster family, the B. family. However, yet again, she later opted out of the extension of foster care. In January 2012, she contacted DCS again and informed them that she was homeless. DCS contacted DIDD and "told them her situation was critical." Mother was subsequently accepted into DIDD, which helped Mother obtain housing in Jackson, Tennessee.[7] Unfortunately, one of the requirements for Mother's current housing is that her children cannot reside with her. In addition, DIDD assisted Mother with obtaining a conservator to manage her financial affairs.

Although still maintaining contact with Mother, DCS filed a petition to adjudicate the children as dependent and neglected at some point, and the petition was heard on May 18,

---

[6] The importance of the car seat is unclear. First, Mother testified that she does not have a vehicle. Second, the children were not in her custody at this time.

[7] Testimony indicates that DIDD also works with an agency called A-Plus Solutions. However, it is unclear how or whether these two entities are related or which services each provided to Mother. Accordingly, to avoid confusion, we only reference DIDD in the opinion. Any distinction would not alter the outcome of our Opinion.

2012. Shelby County Juvenile Court Judge Curtis S. Person found the children dependent and neglected. In the order dated May 18, 2012, the juvenile court noted that "Mother's current housing situation prevents her from having custody of her children and that the children are dependent and neglected as her current residence is unavailable to them." In addition, the order provides that it was reasonable for DCS not to make efforts "to maintain the children in the home due to allegations of environmental neglect."

On February 12, 2013, DCS filed a Petition for Termination of Parental Rights in Shelby County Chancery Court.[8] As grounds for termination, DCS alleged that (1) Mother was incompetent to care for and supervise the children and (2) the conditions that warranted removal of the children persisted and would unlikely be remedied in the near future. DCS also averred that it was in the children's best interest that Mother's parental rights be terminated.

A bench trial was held on July 8 and 9, 2014. Several witnesses testified: Dr. Mindy Kronenberg, a clinical psychologist; Sharron Nabors, a DCS family service worker; Leuren Miller, a family care counselor at Youth Villages; Foster Mother; and Mother.

Dr. Kronenberg testified first. She testified that, in her expert opinion, Mother was mentally incompetent with regard to parenting her two children. Dr. Kronenberg met with Mother on several occasions spanning nearly eight hours. Dr. Kronenberg admitted that she had not examined Mother in approximately two years but opined that this passage of time only equated with the children developing a stronger attachment to Foster Parents. She stated that Mother "clearly loves her children" but that she did not have the ability to understand their perspective. For example, when one of the children began crying during a session with Dr. Kronenberg, Mother became upset with her inability to console the child and relinquished care back to Foster Mother, who was also present. To Dr. Kronenberg, Mother's inability to understand the children's perspective "impedes attachment" and can be associated with abuse and neglect.

Dr. Kronenberg also testified about Mother's Intelligence Quotient ("IQ"). Mother's IQ was measured as 58, which is in the "mild intellectually deficient range." Further, Mother also tested low on an adaptive functioning test. Coupled together, the results of these two scores demonstrate that Mother possesses the judgment of an eight- to ten-year-old child. Dr. Kronenberg noted, however, that Mother's judgment often varied depending on the situation she was in. Still, she testified that a low or deficient IQ does not equate with an inability to parent because, for example, it can be associated with a lack of education or otherwise biased. She explained that many people with a low IQ can parent their children; however, Dr.

---

[8] DCS filed an amended petition on May 7, 2013.

Kronenberg opined that Mother was not competent to parent her children based on both her low IQ and her low adaptive functioning score. To this end, Mother displayed an inability to motivate herself independently, empathize with her children, and develop a parent-child relationship. Ultimately, Dr. Kronenberg stated that, "I do not believe [Mother] can take care of them. I do believe she loves them. I don't think she has the functional abilities to take care of the children." Dr. Kronenberg's Psychological Evaluation of Mother, which was completed at the request of DCS, was admitted as an exhibit at trial. Ultimately, from her assessment of Mother, Dr. Kronenberg opined that Mother has made improvements and would continue to improve in "concrete areas," but Mother is incompetent as far as "abstract thinking . . . understanding other people's feelings, which leads to helping children understand their own feelings, which leads them to develop a sense of whole self." In addition to opining that Mother was incompetent as far as caring for her children, she also stated that it was in the children's best interest to be adopted by Foster Parents.[9]

Sharron Nabors, a DCS family service worker, testified next. She became involved with Jamarcus in March 2011 after allegations of abuse by Mother, and she became involved with Domingo when he was born in September 2011. Ms. Nabors testified about the efforts DCS expended in order to reunify Mother with the children, including various assessments, parenting classes, individual counseling, and regular visitation with the children. DCS also assisted Mother with applying for Social Security, which was a requirement for admittance to DIDD. DCS further assisted Mother with obtaining housing in Jackson, Tennessee, through DIDD. Ms. Nabors explained Mother's placement and the services DIDD provided thusly:

> They are based on their IQ. If their IQ is a certain thing, and they require assistance in day-to-day living or assistance with that, then they can go into that program. It's a lifelong program. They are in the program for forever until they no longer want to be in the program, but they assist them with housing and to care for - - pay their bills, take care of themselves, education, medication, pretty much anything they need help with.

She confirmed that Mother was not allowed to have her children with her while placed in this program, and she stated that Mother was aware of this prohibition. Through DIDD, Ms. Nabors explained, Mother was appointed a conservator "because of the irrational

---

[9] It appears that, at some point, Foster Mother suggested an arrangement whereby Mother could maintain some level of visitation with the children. Dr. Kronenberg also stated that she believed it was in the best interest of the children for Mother to be able to visit the children if she remained "stable."

decisionmaking she was doing." Further, according to Ms. Nabors, Mother would not have been able to support herself without DCS's assistance.

Ms. Nabors also testified about her observations of Mother's relationship with the children. She stated that Mother often lost her temper and became easily frustrated, and "[s]he is easily frustrated because she can't deal with them both at the same time." Mother often responded by screaming at the children, or "she will just say forget it," according to Ms. Nabors. Ultimately, Ms. Nabors testified that the conditions regarding Mother's temper and her inability to appropriately control and supervise the children would not be remedied in the near future so as to return the children to her home safely.

Ms. Nabors also testified about Mother's education, which ended at the eighth grade.[10] She explained that Mother's biological mother had taken her out of school for some reason and failed to reenroll her. When Mother came into DCS custody as a teenager,[11] DCS attempted to enroll her in school and took Mother to the truancy office. Mother became upset with the truancy officer and "said a few things," and the truancy officer denied her readmission into the school system. Mother was then referred to a GED program but could not enroll because she scored poorly on the literacy part of the pre-test to qualify for placement in the program. Ms. Nabors testified that during DCS's attempt to enroll Mother in the GED program, there was also a program offered "to try to help her improve her reading, . . . to try to get to a level where she could do GED classes." Ms. Nabors testified, however, that Mother "did not participate" in these classes.[12] Ms. Nabors explained that several things contributed to Mother and DCS's inability to follow through with any sort of continuation of Mother's education, including Mother's frequent "disruptions" of her foster care placement, her pregnancy, the birth of Domingo, her mental instability, and her resulting ten-day stay at Saint Francis Hospital.

Turning to the children's foster care placement, Ms. Nabors testified that the children are doing extremely well in their care. She explained that Jamarcus had some anger and behavioral issues when he was first placed, but he has been "mannerable, sweet, making

---

[10] Mother testified that she "started high school, but didn't finish it." When asked why she did not continue her high school education, she stated that she, DCS, and her foster parent "got ready to register me, and the school system said no."

[11] It is unclear if DCS's attempt to reenroll Mother in school occurred when Mother first came into DCS custody at approximately age fourteen or fifteen or when Mother came into DCS custody again at age seventeen.

[12] It is unclear whether Mother's lack of participation was caused by DCS or Mother herself. In her own testimony, Mother denied that DCS attempted to enroll her in a literacy or reading program while in custody.

progress in school" since being placed with Foster Parents. Jamarcus also looks to Foster Parents as his parents and their biological daughter as his sister. Similarly, Foster Parents are the only parents Domingo has ever known as he has resided with them since birth. Although somewhat confusing, Ms. Nabors's testimony indicates that both children refer to Mother and Foster Mother as "mom," depending on the situation. According to Ms. Nabors, to remove the children now from the care of Foster Parents would be detrimental to both.

Leuren Miller, a foster care counselor at Youth Villages, also testified about her observations at Mother's four-hour monthly visitations with the children. She explained that the children had a bond with Mother and were generally happy to see her when they arrived at visitation. She testified that Mother would often buy gifts and food for the children and that they enjoyed spending visitation time with Mother at her home. Still, Ms. Miller stated that Mother currently still struggles to control her temper and often needed to be redirected as to what was appropriate parenting. As an example, she testified that she had to remind Mother to supervise the children at a visitation at Chuck-E-Cheese instead of playing the games herself. She stated that Mother skipped visitation several times, indicating "she would rather - - it was an event called Africa in April. She said she wanted to go to that and she would skip this - - would skip [the visitation in April], and she just wanted to visit with the kids in May." According to Ms. Miller, Mother would travel to Memphis but then ultimately prioritize other activities over visitation. It is important to note that the record does not contain a comprehensive list of the total visitations attended by or missed by Mother. Despite the issue with missed visitations, Ms. Miller testified that Mother loved the children, the children loved her, and they shared a bond.

Foster Mother testified next. She testified as to her and her husband's willingness to adopt the children, because "they are some loving kids. They are sweet. They have been in my home for a while[.]" She stated that the children have become part of her family, and she and her husband are financially able to care for the children. Additionally, she expressed that she was comfortable in continuing to provide visitation with Mother even after an adoption, mainly on holidays and birthdays.

Mother testified last. She generally corroborated much of the above testimony. However, she testified that the reason the children entered DCS custody was because she had nowhere else to live and that she was also in DCS custody. Regarding her living situation, she explained that she can leave DIDD whenever she wants, and she is capable of taking care of the children on her own. Mother testified that she would be able to provide for the children using her social security check. When asked whether she had a plan to leave DIDD, she responded, "I'm just going to save up and get a job and save up enough money to do it." She also confirmed that a house manager is with her around-the-clock to "check up on me and see what all needs to be done in the house, basically." Still, Mother is able to utilize public bus

transportation and travel to Memphis on her own for visitations. She stated she would be able to use public transportation to ensure the children attended all of their appointments. Additionally, although DIDD provides assistance paying her bills, the entirety of her expenses comes from her own income from Social Security. She testified that she genuinely loves the children and believes they love her. Mother testified that she believes she has the mental capacity to provide, care for, and supervise the children.

At the conclusion of the trial on July 9, 2014, the trial court made its oral ruling terminating Mother's parental rights. The trial court entered its written ruling on August 1, 2014. Although the trial court did not incorporate its oral ruling by reference into the written order, it made similar thorough findings of fact and conclusions of law in its written order outlining the events leading up to the filing of the termination petition, DCS's efforts to work with Mother, Mother's living arrangements, Mother's competency, visitation, and the children's needs. Based on these underlying facts, the trial court found that two grounds were established by clear and convincing evidence: (1) Mother was incompetent to care for and supervise the children under Tennessee Code Annotated Section 36-1-113(g)(8) and (2) the conditions warranting removal of the children persisted and prevented the children from safely returning to Mother's care at an early date under Tennessee Code Annotated Section 36-1-113(g)(3)(A). The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest pursuant to Tennessee Code Annotated Section 36-1-113(c)(2).

Mother timely filed this appeal.

## Issues

Mother presents three issues for review, as restated from her brief:

> 1. Whether the trial court erred when it found grounds existed to terminate Mother's parental rights.
>
> 2. Whether the trial court erred when it found that DCS had made reasonable efforts to reunify Mother with her children.
>
> 3. Whether the trial court erred when it found that termination of Mother's parental rights was in the best interest of the children.

## Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645,

651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. ***Nash-Putnam***, 921 S.W.2d at 174–75 (citing ***Santosky v. Kramer***, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the juvenile court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the juvenile court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See* ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

**Analysis**

Reasonable Efforts

As an initial matter, we address Mother's argument that DCS failed to make reasonable efforts to reunify Mother with her children. Specifically, Mother argues that DCS did not enroll Mother in a transitional living program, teach her to care for herself, or provide her with educational opportunities. Mother asserts that DCS cannot now rely upon Mother's alleged incompetency when it failed to make efforts to increase her competency while she herself was in DCS custody. Accordingly, we must examine whether DCS was required to make reasonable efforts toward reunification in this case.

Reasonable efforts by DCS are not one of the elements that must be proven to effect a termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(c); ***In re Kaliyah S***, 455 S.W.3d 533, 552–53 (Tenn. 2015) ("Grounds for termination and consideration of the child's best interest are the only two elements expressly listed in Section 36-1-113"). Although nothing in the language of Section 36-1-113 specifically requires a petitioner to prove reasonable efforts were made towards reunification, "the language of the statute indicates only that the trial court is to consider DCS's reasonable efforts, or the lack thereof, in determining whether termination of the parent's rights is in the child's best interest." ***Kaliyah S.***, 455 S.W.3d at 554.[13] Accordingly, we will consider DCS's reasonable efforts in the context of our best interest analysis.

Grounds for Termination

---

[13] According to the Supreme Court in ***Kaliyah S.***:

> Apart from the reference in one of the best-interest factors, the phrase "reasonable efforts" appears only tangentially in Section 36-1-113. The definition of one ground for termination, abandonment, mentioned reasonable efforts. [Tenn. Code Ann.] §§ 36-1-113(g)(1), -102(1)(A)(ii) [(abandonment by failure to provide a suitable home for the child)]. In addition, Section 36-1-113 provides that DCS *may* elect not to file a petition to terminate parental rights if it has not yet made reasonable efforts to reunify the parent and child. ***Id.*** § 36-1-113(h)(2)(C). Section 36-1-113 does not otherwise refer to DCS's obligation to make reasonable efforts to reunify the child with the parent.

***Kaliyah S.***, 455 S.W.3d at 554 (footnotes omitted).

11

### *Mental Incompetence*

We next address Mother's argument that the trial court erred in finding clear and convincing evidence supported termination on the ground of her mental incompetence. Mother contends that the improvements to her behavior and her emotional stability preclude a finding of incompetence. To this end, Mother focuses on the fact that Dr. Kronenberg's evaluation of Mother took place nearly two years prior to the trial in this matter. Further, Mother notes that Dr. Kronenberg and Ms. Miller (the Youth Villages foster care worker) stated that it was obvious that Mother loved the children. Additionally, Ms. Nabors (the DCS family services worker) testified that Mother's decision to enter the DIDD program demonstrated good judgment.

Despite Mother's alleged improvements, the trial court still found that Mother's intellectual deficiencies rendered her unable to care for herself or her children presently and in the near future. Relying heavily on the testimony of Dr. Kronenberg, the trial court concluded that Mother had a mildly deficient IQ coupled with low adaptive functioning and inability to empathize with her children. Based on these intellectual deficiencies, the trial court found incompetence was proven by clear and convincing evidence as Mother would not be able to resume the care and supervision of the children in the near future.

Regarding incompetency, Tennessee Code Annotated Section 36-1-113(g)(8)(B) provides:

> The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii) That termination of parental or guardian rights is in the best interest of the child[.]

12

Tenn. Code Ann. § 36-1-113. DCS carries the burden of demonstrating by clear and convincing evidence that "[the parent] is unable to care for the children and that it is unlikely that [the parent] will be able to do so in the near future." ***In re Keisheal***, No. M2012-01108-COA-R3-PT, 2013 WL 440061, at *7 (Tenn. Ct. App. Feb. 4, 2013) (citing Tenn. Code Ann. § 36-1-113(g)(8)). Additionally, we note that the statute explicitly states that, for this ground, "no willfulness" on the part of the parent "need be shown to establish that the parental . . . rights should be terminated[.]" Tenn. Code Ann. § 36-1-113(g)(8)(C).

Much of the testimony presented at trial revolved around whether Mother was competent to care and supervise the children. Dr. Kronenberg's evaluation of Mother revealed that Mother's intellectual deficiencies prohibited her from empathizing with the children. In her expert opinion, although people with low IQs can still parent a child, Mother's adaptive functioning precluded her from being able to console, calm, or direct the children. Dr. Kronenberg further stated that this lack of empathy can be associated with neglect and abuse. She opined that Mother's functioning is similar to an eight- to ten-year-old child.

Dr. Kronenberg's conclusions about Mother's competency stem from her analysis of the various evaluations and assessments she and other professionals performed on Mother. DCS family service worker Ms. Nabors testified that Mother often had difficulty controlling her emotions. She testified that Mother "is easily frustrated when dealing with the kids . . . [S]he gets upset, she screams at them. . . . When things became too difficult, she will just say forget it. I don't want to do it. I can't do it. I don't want to do it anymore. I don't care what happens." Ms. Nabors also recounted the efforts DCS made attempting to reenroll Mother in school and the ultimately successful endeavor to enroll her in DIDD when Mother did not qualify for the GED test. Despite these efforts, Dr. Kronenberg and Ms. Nabors testified that Mother is essentially in the position she was several years ago, where she currently requires constant support with everyday tasks, around-the-clock monitoring, and a financial conservator. Mother's inability to independently care for her own welfare supports the conclusion that she is incompetent to care for the children. Further, she has no real plan that she can articulate as to how she intends to resume care of these children in the near future. It appears her intellectual deficiencies, despite the efforts of DCS, remain unremedied.

Although we note that Dr. Kronenberg's findings were borne of her interactions with Mother almost two years prior to trial, Ms. Miller's testimony demonstrates that the concerns Dr. Kronenberg had with Mother's other parenting issues still remain. Ms. Miller testified that Mother considered her own desires ahead of her children's, resulting in missed visitations or a lack of supervision. Ms. Miller's testimony, in our opinion, substantiates Dr. Kronenberg's expert opinion that Mother is still unable to see the children's perspective because of her intellectual deficiencies. There is overwhelming testimony that Mother still

remains unable to live independently and still fails to demonstrate an ability to properly care for and supervise the children. Further, Mother's lack of empathy and inability to understand her children's perspective was testified to as occurring as recently as several months before trial. Unfortunately, these characteristics are associated with abuse and neglect, according to Dr. Kronenberg, and demonstrate that Mother's incompetence is still present. We have no doubt that Mother's strides to overcome her deficiencies have been commendable. Still, the evidence does not suggest that Mother's condition or her living arrangements can be remedied at any time in the near future so that she could care for her children.

In light of the foregoing, we conclude that DCS has met its burden and proved by clear and convincing evidence that Mother is (1) presently incompetent and unable to adequately care for and supervise the children because of her mental impairment and (2) such mental impairment and incompetence is so likely to remain that it is unlikely that Mother will be able to adequately care for and supervise the children in the near future.

### *Persistence of Conditions*

Although only one ground must be proven by clear and convincing evidence to justify termination, the Tennessee Supreme Court has directed this Court to review the findings of fact and conclusions of law as to each ground for termination, in order to avoid unnecessary remand. *See **In re Angela E.**, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Thus, we next consider the issue raised by Mother regarding the juvenile court's finding of persistence of conditions.

Mother's argument as to this ground focuses on her current living arrangement. She contends that the choice to live as part of the DIDD program, which does not allow children, is completely within her discretion. Accordingly, Mother asserts that should her children be returned to her, she would find adequate housing for both herself and the children. She also avers that she has improved her situation with regard to her condition when she first began her history with DCS. She testified that if her children are returned to her, she is able to provide food, clothing, and shelter using her Social Security income. In addition, Mother argues that instances of her emotional instability occurred during her minority and were the result of her own tumultuous upbringing.

The trial court also relied upon Mother's incompetency to support the termination of Mother's parental rights on the separate ground of persistent conditions. Accordingly, many of the trial court's findings as to these two grounds overlap. With regard to this ground, the trial court found that Mother had improved her personal situation slightly but still relied heavily on external support. In addition to requiring support to manage her housing and financial affairs, the trial court found that Mother's intellectual deficiencies still persist.

14

Despite DCS's efforts to facilitate counseling and visitations for Mother, the trial court concluded that "the conditions which lead to removal still persist and other conditions exist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's safe return to [Mother]." The trial court also noted that these conditions were likely to remain unremedied and that the continuation of the parent-child relationship hindered Jamarcus and Domingo's integration into a more stable home.

Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions that led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to

15

prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

In this case, it is undisputed that both children have been removed from Mother's care for over six months. *See* Tenn. Code Ann. § 36-1-113(g)(3). Jamarcus, now five years old, has been living with Foster Parents since he was three years old. Domingo, now two years old, has been living with Foster Parents since he was born. However, Mother argues that the record lacks sufficient evidence to support the trial court's conclusion that the conditions that led to the children's removal and conditions that otherwise preclude return of the children still persist and would, in all reasonable probability, subject the children to further abuse or neglect.

As stated above, clear and convincing evidence in the record supports the trial court's conclusion that Mother is mentally incompetent to care for her children. Furthermore, the record includes much evidence reflecting on the inability of Mother to ameliorate her current intellectual deficiencies to the point where it is safe for her to resume care of the children. Dr. Kronenberg testified that Mother's intellectual deficiencies would prohibit her from caring for her children in the near future. Despite Mother's best efforts, Dr. Kronenberg opined that Mother simply does not have the "abstract capacity" to develop into an adequate caretaker for her children. Ms. Nabors's testimony echoes Dr. Kronenberg's, providing that Mother, despite some improvement, is still too emotionally unstable to parent the children. Both Dr. Kronenberg and Ms. Nabors agreed that it was unlikely for Mother's mental incompetence to ever improve to the point she would be able to care for the children, much less in the near future.

The evidence also suggests that Mother has made some strides in obtaining a more stable home life with DIDD; however, if Mother's children were returned to her, she would be forced to leave DIDD, a program that has no doubt contributed to an increase in stability for Mother.[14] Although we believe that Mother genuinely wants to take care of and provide for her children, her mental incompetence and inability to adapt to certain situations precludes her as a caretaker. Even though she testified that she could leave DIDD at any time, she has no plan other than to "save up and get a job and save up enough money to do it." She testified that she also planned to enroll in a school, but that was on a "standstill."

---

[14] Mother testified that she was aware of these requirements when she was accepted into DIDD's housing.

16

Mother further stated that she planned to work on her anger issues, but she currently was not in counseling. She remains unaware of the amount of rent she pays each month. All of these things coupled together demonstrate that Mother remains incompetent, and it is unlikely for her to overcome such mental deficiencies in the near future. It would be simply illogical to conclude that Mother would be able to develop such an independent lifestyle conducive to raising children in a short period of time. We remain sympathetic to Mother's intellectual deficiencies and her history, but with regard to this ground, we must conclude that clear and convincing evidence exists to prove that Mother's incompetence and her inability to care for her own affairs and her children's remain a persistent condition.

Further, although Mother and the trial court focused on Mother's current living arrangement with DIDD, we note that physical abuse played a role in the removal of her children. Jamarcus, as a toddler in Mother's care, suffered a knot on the back of his head after Mother became upset and pushed him. Upon our *de novo* review of the record, we conclude that clear and convincing evidence also exists as to the persistence of Mother's inability to control her emotions, especially her frustration and anger. The testimony of Dr. Kronenberg, Ms. Nabors, and Ms. Miller all recount specific instances of Mother either screaming, becoming upset, or otherwise mishandling the children. Although the testimony shows that these problems could sometimes be remedied if Mother was redirected to display a calmer response, Ms. Miller testified that Mother would not be able to control or redirect her emotions without constant supervision if the children were returned to her care. Accordingly, we conclude that Mother's inability to control her temper also persists and precludes the return of the children to her care.[15]

Based on the foregoing, we affirm the trial court's conclusion that clear and convincing evidence supports the termination of Mother's parental rights on the ground of persistence of conditions.

Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental

---

[15] While Mother's inability to control her temper and frustration could stem from her intellectual deficiencies, it was not specifically relied upon in the trial court's order. To this end, we note that the Court of Appeals may affirm a judgment on different grounds or for different reasons than those relied upon by the trial court. *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 40 (Tenn. Ct. App. 2004).

conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

18

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Based upon the foregoing discussion, it is clear that Mother has struggled to make an adjustment of circumstances, conduct, or conditions so as to make it safe and in Jamarcus and Domingo's best interest to be in her care. Despite DCS's efforts and the efforts of various support agencies, discussed *infra*, Mother has failed to make a lasting adjustment, as evidenced by the fact that, *inter alia*, she receives around-the-clock monitoring and has a financial conservator. If the children were returned to her, Mother would most likely lose this vital support system that has certainly contributed to any progress that she has made. More importantly, it is questionable whether her current mental state would promote the children's well-being if returned to her, as suggested by the testimony concerning her inability to control her temper and inability to adequately supervise or care for them. Additionally, she further demonstrates her incompetence and lack of empathy as she has often prioritized her own wants over the needs of her children, including that of regular visitation.

19

The record indicates that the children have done well in Foster Parents' care. Foster Mother testified that she and her husband are able to financially support the children and that they think of them as part of their family. To this end, she testified that the children have created a strong bond with her family. The testimony shows that Jamarcus looked to Foster Parents as his parents, and for Domingo, Foster Parents are the only parents he has ever known. Foster Mother expressed a desire to legally adopt both Jamarcus and Domingo into her family.

Regarding their well-being in Foster Parents' care, all of the witnesses at trial, including Mother, testified that Foster Parents were good caretakers of the children. Indeed, Mother experienced the care of Foster Parents firsthand while she resided in their home. In addition, testimony showed that Jamarcus initially had behavioral and anger issues but has since become "sweet" and well-mannered since coming into Foster Parents' care. From the record, it appears that a change in caretakers and a change in the physical environment that both children have known for over two years would have a negative effect. To remove them at this point and place them in what is still an unstable environment with Mother would likely have a detrimental effect on the children so as to undo any positive changes made by them, including the children's attachment to Foster Parents and Jamarcus's improved behavior. [16]

Applying the foregoing statutory factors, and for the stated reasons, it is clear that Mother has not made a lasting change in her conduct or condition that would allow the children to return to her care at an early date. She relies upon several agencies for her own welfare. Mother's own plan for caring for her children gave no indication that Mother would be able to obtain the kind of extensive support that she requires simply for her own care, much less the care of two additional children. While this Court does not doubt Mother's love for her children, the record does not support her assertion that she would be able to provide Jamarcus and Domingo with the stable emotional and developmental support that they require at this stage in their young lives. From the totality of the circumstances, we conclude that clear and convincing evidence exists to support the trial court's conclusion that termination of Mother's parental rights is in both Jamarcus and Domingo's best interest.

## Conclusion

For the foregoing reasons, we affirm the Shelby County Chancery Court's order terminating Mother's parental rights to Jamarcus and Domingo on the grounds of incompetency and persistence of conditions. We also affirm the trial court's order finding it

---

[16] Although we recognize that the best interest determination must focus solely on the children, rather than parents, *see Moody*, 171 S.W.3d at 194, we note from the record that it appears that returning the children to Mother would also have detrimental effect on Mother, as the services that she relies upon may no longer be available.

in the best interest of the children to terminate Mother's parental rights. This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant Mother. Because Mother is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE